CINCINNATI INSURANCE, CO. in its capacity as Excess insurer of Tri–Etch, Inc. d/b/a Sonitrol Security Systems of Muncie, Inc., Appellant–Intervenor,

v.

Ruby YOUNG, Personal Representative of the Estate of Michael Young, Appellee–Plaintiff.

No. 18A02–0502–CV–150.

Court of Appeals of Indiana.

Aug. 7, 2006.

peals the trial court's grant of Plaintiff–Appellee–Cross–Appellant, Ruby Young's, Personal Representative of the Estate of Michael Young (the Estate), Motion for Judgment Against Tri–Etch, Inc. (Tri–Etch) on Non–Party Allocation of Fault.

We reverse.

## ISSUES[1]

Cincinnati raises three issues on appeal and the Estate raises three issues on cross-appeal. We find two issues raised on cross-appeal to be dispositive and restate them as follows:

(1) Whether Cincinnati timely filed its notice of appeal; and

(2) Whether the trial court abused its discretion by granting Cincinnati the right to intervene in the proceedings pursuant to Indiana Trial Rule 24(A)(2) after judgment had been rendered and a settlement had been reached by the parties.

## FACTS AND PROCEDURAL HISTORY[2]

On July 6, 1992, Tri–Etch entered into a written contract with MLS, Inc., the owner of Muncie Liquors, to monitor the security alarm system that Tri–Etch had sold to and installed at the Muncie Liquors' store located on Tillotson Avenue, in Muncie, Indiana. Tri–Etch's obligation under the contract was expressly limited to monitoring (1) the night alarm system while it was activated after business hours and (2) a panic or hold up alarm which could be activated by the store clerk pushing one of

Donald J. Tribbett, Scott L. Starr, Starr Austen Tribbett Myers & Miller, Logansport, IN, Attorneys for Appellant.

James R. Fisher, Ice Miller, LLP, Indianapolis, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

## STATEMENT OF THE CASE

Intervenor–Appellant–Cross–Appellee, Cincinnati Insurance Co. (Cincinnati), ap-

---

1. Prior to turning to the merits of the issues before us, we decide on the following motions: We grant Cincinnati's Motion to Strike the documents found behind Tab 2, Tab 7, and Tab 8 of the Estate's Appendix, but we deny Cincinnati's Motion to Dismiss Plaintiff's Cross–Appeal and deny Cincinnati's Motion for Leave to File Reply.

2. In our recitation of the facts and procedural history, we rely in part on our supreme court's decision in *Young v. Tri–Etch, Inc.*, 790 N.E.2d 456, 456–59 (Ind.2003).

the several hidden panic buttons located at various places throughout the store during business hours. Additionally, there was evidence that Tri–Etch provided a separate service to Muncie Liquors not described in the contract. Specifically, if the store's alarm had not been set within a certain amount of time after the store's usual closing time, Tri–Etch would contact the store. If no employee answered, Tri–Etch would first notify the store's general manager, and then call the police. The store's usual closing time was midnight. In the event the alarm was not activated by this closing time, Tri–Etch customarily notified the store or, if no answer, its general manager, by 12:30 a.m.

On August 12, 1997, Michael Young (Young) was employed as a clerk at Muncie Liquors' Tillotson Avenue location. At some time after 11:50 p.m. but before Young could activate the store's alarm, Michael Moore (Moore) robbed the store at gunpoint, and kidnapped Young. Moore drove Young to a nearby park, beat him severely, and left him tied to a tree. The alarm was never set. Tri–Etch failed to call the store or the general manager to notify that the alarm had not been activated until approximately 3:15 a.m. Young was found alive at approximately 6:00 a.m. the next morning but died as a result of his injuries later that day. The Estate presented evidence that had Young been found earlier, he might have survived.

At the time of the robbery, Tri–Etch's liability was covered by three insurance policies. Scottsdale insurance company (Scottsdale) had issued a common general liability (CGL) insurance policy with a $1,000,000 limit of liability, while Cincinnati had issued two policies to Tri–Etch: (1) a CGL policy with a $1,000,000 limit of

liability and (2) a commercial umbrella liability policy providing $1,500,000 in excess insurance.

On August 6, 1999, the Estate filed a wrongful death action against Tri–Etch and Sonitrol Corporation,[3] which was amended on March 28, 2000, alleging that Tri–Etch had assumed a duty to notify Muncie Liquors by 12:30 a.m. if the alarm was not activated by that time. Scottsdale elected to pursue Tri–Etch's defense under its CGL policy. On January 30, 2001, Tri–Etch filed its Motion for Summary Judgment asserting that the Estate's wrongful death action was barred by a one-year limitations period contained in the contract between Muncie Liquors and Tri–Etch. On May 22, 2001, after briefing and argument, the trial court granted Tri–Etch's motion upon finding that the Estate's claim was governed by the terms of the contract and that more than one year had passed between Young's murder and the filing of the complaint.

The Estate appealed and we affirmed the trial court's decision. After granting transfer, our supreme court reversed and remanded to the trial court for further proceedings upon holding that the Estate's claim sounded in tort, not in contract, and therefore the contractual limitation period did not apply to the Estate because Young, as an employee, was not a party to the contract.

On or before March 17, 2004, Tri–Etch, by counsel, made a written demand upon Cincinnati to defend Tri–Etch under its CGL policy. Cincinnati denied coverage and instead filed a declaratory judgment action in the United States district court for the southern district of Indiana against its insured seeking a declaration that Cin-

---

**3.** Sonitrol Corporation is the franchisor of Tri–Etch and was eventually dismissed from   this case.

cinnati did not have to provide coverage for Tri–Etch under either of its two policies.[4]

On April 5 until April 8, 2004, a jury trial was held. Prior to the commencement of the trial, the Estate filed a Motion and Memorandum for Judgment on the Evidence as to Affirmative Defense of Non–Party Fault against Moore. On April 8, 2004, the trial court denied the motion. On April 15, 2004, the trial court granted a mistrial *nunc pro tunc* April 8, 2004 when the jury told the court they were unable to reach a verdict. On December 6 through December 10, 2004, a second jury trial was held. At the close of the evidence, the jury found in favor of the Estate and assessed 40% of the fault to Tri–Etch and 60% of the fault to the non-party, Moore, with total damages of $2,500,000. That same day, the trial court entered judgment against Tri–Etch pursuant to the jury's verdict, in the amount of $1,000,000.

On December 28, 2004, the Estate filed its Motion for Judgment Against Tri–Etch on Non–Party Allocation of Fault, requesting that judgment be entered against Tri–Etch for the total amount of damages of $2,500,000 based on the argument that Tri–Etch was responsible for the fault assessed against the non-party, Moore. On January 7, 2005, after receiving Tri–Etch's response, the trial court entered its Order granting the Estate's motion and directing that judgment be entered against Tri–Etch for the full amount of the damages.

Thereafter, on January 10, 2005, Tri–Etch filed its Motion to Correct Error.

On January 21, 2005, counsel for the Estate notified Cincinnati in writing that a settlement had been reached with Tri–Etch and Scottsdale. The agreement provided for payment of $1,000,000 by Scottsdale, as Tri–Etch's CGL insurer, to the Estate with assignment of Tri–Etch's breach of contract claim against Cincinnati to the Estate. Furthermore, this agreement specifically provided Cincinnati with the opportunity to reconsider its previous denial of coverage to Tri–Etch and permitted Cincinnati to assume control of the defense of this matter, including the right to pursue an appeal on behalf of its insured. On January 27, 2005, Cincinnati was again requested to assume the defense of Tri–Etch and pursue an appeal under either or both of its insurance policies by January 28, 2005. If Cincinnati refused, Tri–Etch would withdraw its motion to correct error and consummate its agreement with the Estate not to appeal from the adverse judgment. On February 2, 2005, Tri–Etch withdrew its motion to correct error and, that same day, Cincinnati moved to intervene for the purpose of appealing the judgment in its own name only. The next day, February 3, 2005, Cincinnati reaffirmed to its insured that it would not acknowledge coverage under either of its insurance policies.

On February 17, 2005, the trial court granted Cincinnati leave to intervene. Thereafter, on April 7, 2005, the Estate filed a motion with this court to dismiss Cincinnati's appeal. Meanwhile, on May 20, 2005, the Estate and Tri–Etch filed a

4. Even though we granted Cincinnati's motion striking the Complaint for Declaratory Judgment included within the Estate's Appendix, the fact that Cincinnati filed this Complaint was mentioned within Cincinnati's Reply Memorandum in Support of Its Motion to Intervene as a Party Defendant for Purposes of Pursuing an Appeal included within its Supplemental Appendix. Cincinnati's Memo-randum is littered with numerous admissions that the insurer filed a declaratory judgment action in the United States district court for the southern district of Indiana in order to contest coverage. (Appellant's Supp.App. pp. 1–13). Moreover, as an exhibit to its Memorandum, Cincinnati included counsel for the Estate's notice of appearance before the district court. (Appellant's Supp.App. p. 14).

state court action against Cincinnati to recover the unpaid portion of the final judgment against Tri–Etch. On June 9, 2005, the court of appeals' motions panel denied the Estate's request for dismissal.

Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

As the Estate's issues on cross-appeal strike at the core of Cincinnati's right to appeal, their resolution soundly disposes of the case without requiring this court to address the merits of Cincinnati's appeal. However, in analyzing the Estate's issues, we are presented with a procedural minefield in which we will tread lightly and carefully.

■ We note at the outset that both of the Estate's contentions raised on cross-appeal were already the subject of its Motion to Dismiss Appeal filed with this court on June 9, 2005. After review, our motions panel denied the Estate's motion to dismiss. Even though the motions panel has already ruled on the issues developed by the Estate in its cross-appeal, the Estate is not precluded from presenting its arguments to us. *See Smith v. Deem*, 834 N.E.2d 1100, 1103 (Ind.Ct.App.2005), *trans. denied.* It is well established that we may reconsider a ruling by the motions panel. *Oxford Fin. Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1141 (Ind.Ct.App.2003). However, "we decline to do so in the absence of clear authority establishing that it erred as a matter of law." *Id.*

### I. Timeliness of Cincinnati's Notice of Appeal

First, the Estate contends that we lack jurisdiction due to Cincinnati's untimely appeal. Specifically, the Estate asserts that because Cincinnati filed its notice of appeal prior to becoming a party to the instant cause, Cincinnati's notice did not become effective until the trial court granted its motion to intervene, which was after the time for filing a notice of appeal had expired.

Indiana Appellate Rule 9 governs the rules for initiating an appeal, and provides in section (A)(1) that "[a] party initiates an appeal by filing a Notice of Appeal with the trial court clerk within thirty (30) days after the entry of a Final Judgment." Our review of the record establishes that the trial court entered its final judgment on January 7, 2005. Accordingly, the time for filing a timely notice of appeal would expire on February 6, 2005. Four days prior to the expiration of this time limit, *i.e.*, on February 2, 2005, Cincinnati filed its Petition seeking Permission to Intervene, while at the same time, it filed a notice of appeal. Even though, at first glance, Cincinnati appears to have timely filed its notice of appeal, the Estate now claims that Cincinnati only became a party and thus would be able to file a valid notice of appeal, upon the trial court's grant of Cincinnati's motion intervene on February 17, 2005. Because February 17, 2005 falls outside the time limit to file an appeal, the Estate maintains that Cincinnati's appeal was untimely.

■ We are not persuaded. The underlying issue of the Estate's contention clearly focuses on Cincinnati's status as a party. In this regard, Indiana Trial Rule 4 (emphasis added) provides that "[t]he court acquires jurisdiction over a party or person who under these rules commences or joins in the action, is served with summons or *enters an appearance,* or who is subjected to the power of the court under any other law." Based on the chronological case summary, counsel for Cincinnati filed his appearance on February 2, 2005. Thus, pursuant to Ind. Trial Rule 4 the trial court acquired jurisdiction over Cin-

cinnati on February 2, 2005. As such, Cincinnati became a party and timely filed its notice to appeal four days prior to expiration of the time to appeal a final judgment. Consequently, we have jurisdiction to hear this case on its merits.

## II. *Cincinnati's Intervention on Appeal*

■■ Next, the Estate contends that the trial court erred in granting Cincinnati's motion to intervene pursuant to Indiana Trial Rule 24. The grant or denial of a petition to intervene is within the discretion of the trial court. *Herdrich Petroleum Corp. v. Radford,* 773 N.E.2d 319, 324 (Ind.Ct.App.2002), *reh'g denied, trans. denied.* We review a trial court's order allowing intervention for an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or reasonable and probable inferences to be drawn therefrom. *Id.*

■■■ Indiana Trial Rule 24(A), governing the right to intervene, stipulates that:
Upon timely motion anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to a property, fund or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect his interest in the property, fund or transaction, unless the applicant's interest is adequately represented by existing parties.

In Indiana there is relatively little case law regarding the right of insurance companies to intervene in their own name for purposes of appeal while the question regarding coverage is pending and after a settlement between the victim and the insured has been executed. Indiana cases interpreting Indiana Trial Rule 24(A)(2) have traditionally adopted the three-part test followed by the Federal courts in their interpretation of its numerical counterpart in the Federal Rules of Civil Procedure. *See Westfield Ins. Co. v. Axsom,* 684 N.E.2d 241, 242 (Ind.Ct.App.1997). As a matter of law, this test requires that intervenors show (1) an interest in the subject of the action, (2) disposition of the action may as a practical matter impede the protection of that interest, and (3) representation of the interest by existing parties is inadequate. *Id. See also Herdrich Petroleum Corp.,* 773 N.E.2d at 324. In addition, a court must also consider the timeliness of the request in deciding whether or not to grant a motion to intervene. *Westfield Ins. Co.,* 684 N.E.2d at 242. Even though our courts have agreed on the four factors that must be satisfied for intervention of right, our courts disagree on what facts or circumstances are necessary to meet this test. *Id.* Thus, whether a particular factual situation satisfies this three-part test is within the discretion of the trial court. *Herdrich Petroleum Corp.,* 773 N.E.2d at 324.

The Estate now mainly focuses its argument on the first element—interest in the subject of the litigation-required to intervene as of right. In essence, the Estate's contention rests entirely on the premise that because Cincinnati's interest in a litigation it has continuously refused to defend under either of its insurance policies during the litigation, is dependent upon a determination that Cincinnati breached its contractual obligations to Tri–Etch, Cincinnati's interest is necessarily contingent and indirect. Supporting its assertion, the Estate maintains that overwhelmingly, both the Federal and Indiana courts have held that the interest of an insurance carrier who has denied coverage is too speculative and contingent to justify an intervention pursuant to Indiana Trial Rule 24.

In this regard, the Estate relies on the seminal opinions of *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629 (1st Cir.1989) and *Midwestern Indem. Co. v. Laikin*, 119 F.Supp.2d 831 (S.D.Ind.2000).

The main action in *Travelers Indem. Co.* involved protracted litigation to give effect to a settlement agreement addressing environmental liability. *Travelers Indem. Co.*, 884 F.2d at 631–32. Primary and excess insurers, who had previously reserved the right to deny coverage, now sought intervention. *Id.* at 632. The United States Court of Appeals affirmed the district court's denial of intervention holding that the insurers' interest in minimizing its insured's liability was contingent, precisely because the insurers contested coverage. *Id.* at 638–39. In its analysis, the court referred to a long line of cases establishing the well-known principle that an insurer has a direct interest in a lawsuit brought by an injured party against its insured when the insurer admits that the claim is covered by the policy in question. *Id.* at 638. However, when the insurer offers to defend the insured but reserves the right to deny coverage, the insurer's interest in the liability phase of the proceeding for the purpose of intervention is contingent on the resolution of the coverage issue. *Id.* Reflecting on this rule, the court recognized that to permit intervention where coverage is in dispute would allow an insurer to interfere with and in effect control the defense. *Id.* at 639. Accordingly, the court concluded that such intervention would unfairly restrict the insured, who faces the very real risk of an uninsured liability, and grant the insurer a "double bite at escaping liability." *Id.*

More instructive for the instant case is *Midwestern Indem. Co.*, 119 F.Supp.2d 831. Extensively examining Indiana precedent, the United States district court for the southern district of Indiana considered whether, as here, Indiana law would allow an insurer to effectively relitigate its insured's liability and damages, if the insurer had filed a declaratory judgment on the issue of coverage. *Id.* at 835. In *Midwestern Indem. Co.*, the liability insurer sought a declaratory judgment that it owed no duty to defend or indemnify the insured owners of a mobile home park in connection with a fire in a mobile home that resulted in a death. *Id.* at 834–35.

■ The district court acknowledged that under established Indiana precedent, where an insurer has defended under a reservation of rights or has filed a declaratory judgment action, a judgment between an insured and a tort plaintiff will bind the insurer as to the issues not related to coverage, at least so long as the insured has acted reasonably and in good faith. *Id.* at 837 (quoting *Frankenmuth Mutual Ins. Co. v. Williams*, 690 N.E.2d 675, 679 (Ind.1997); *Liberty Mutual Ins. Co. v. Metzler*, 586 N.E.2d 897, 900 (Ind.Ct.App. 1992)). Ruling otherwise, the district court noted, would encourage denial of coverage and multiply litigation. *Id.* at 842. Analyzing the factual situation, the *Midwestern* court concluded that the insureds had acted in good faith and reasonably in reaching their settlement with the tort plaintiff. *Id.* at 856. We now adopt the excellent opinion issued by the southern district of Indiana in *Midwestern Indem. Co.*

■ Here, the record reflects that Cincinnati issued two policies to Tri–Etch: a CGL policy with a $1,000,000 liability limit and an umbrella insurance providing for $1,500,000 in excess insurance with both policies including a duty to defend clause. Even though Cincinnati was notified on March 17, 2004 of the pending suit between the Estate and its insured, Tri Etch, the insurer refused coverage under both its insurance policies, and instead filed an

action for declaratory judgment regarding the issue of coverage in Federal court. In its brief, Cincinnati concedes that Scottsdale, defending Tri–Etch under its CGL policy, appropriately protected Cincinnati's interests during trial. However, even if we were to accept that Scottsdale guarded Cincinnati's interests during trial, this effectively ended on December 10, 2004 with the entry of the jury's verdict resulting in a total damage award of $2,500,000, well beyond Scottsdale's and Cincinnati's CGL limit. Accordingly, at that point, although the jury verdict only assessed 40% of the fault to Tri–Etch, Cincinnati's umbrella policy could conceivably come into play. Nevertheless, the umbrella policy became certainly involved with the trial court's January 7, 2005 entry of Judgment Against Tri–Etch on Non–Party Allocation of Fault, assessing 100% of the fault to Cincinnati's insured.

Our review of the record further establishes that after the trial court's Order on January 7, 2005, settlement negotiations ensued between the Estate, Tri–Etch, and Scottsdale. On January 21 and 27, 2005, respectively, the Estate notified Cincinnati on the resulting settlement and offered it an opportunity to appeal the judgment in Tri–Etch's name. Both times, Cincinnati refused. Rather, the record shows that approximately five days after consummation of the settlement, Cincinnati filed its motion for intervention in its own name pursuant to Indiana Trial Rule 24(A)(2).

Based on these facts, it is clear that although Cincinnati did not completely abandon its insured, neither did it accept responsibility for the insured's liability coverage. At the time Cincinnati sought to intervene in its own name for purposes of bringing this appeal, the insurance company was still contesting its coverage under both policies through its declaratory judgment action. As we stated before, when an insurer attempts to intervene in the action between its insured and the injured party but reserves the right to deny coverage, the insurer's asserted interest is not cognizable but rather contingent upon the acceptance of coverage before it becomes colorable for the purposes of Indiana Trial Rule 24(A)(2). *See Travelers Indem.* Co., 884 F.2d at 639; *Midwestern Indem. Co.*, 119 F.Supp.2d at 838. Consequently, here, because Cincinnati contested its coverage at the same time it filed its motion to intervene, its interest in the subject matter for purpose of Indiana Trial Rule 24(A)(2) was contingent and not direct.

Our conclusion today is bolstered by the issues Cincinnati attempted to raise on appeal.[5] While Cincinnati repeatedly assures us in its brief that it only appeals in its own name, it nevertheless brings issues that effectively seek to relitigate Tri–Etch's liability. Allowing Cincinnati to raise these issues while it is still contesting its coverage under the insurance policies would grant the insurer two bites at the proverbial apple in an attempt to escape liability: once in this appeal on issues resulting from the underlying trial and again during its pursuit of its declaratory judgment action disputing coverage. *See Travelers Indem. Co.*, 884 F.2d at 639.

In its counterargument, Cincinnati attempts to persuade us that it justifiably intervened based on the umbrella policy's language and focuses this court's attention

---

5. On appeal, Cincinnati raises the following three issues: (1) Whether the trial court erred by granting the Estate's Motion for Judgment Against Tri–Etch on Non–Party Allocation of Fault; (2) Whether the trial court erred by excluding evidence of Michael Moore's alleged drug use; and (3) Whether the trial court erred by instructing the jury that it could make an inference based on Tri–Etch's destruction of certain records.

on Section IV, Article 1, which provides that: "If the insured or any insurer who provides the applicable 'underlying insurance' elects not to appeal a judgment which exceeds the 'underlying limit,' we may elect to do so at our own expense...." (Appellant's App. p. 57). We have to read Cincinnati's proffered contract article together with the contract's clause stipulating the insurer's duty to defend in its umbrella policy. *See Boonville Convalescent Center, Inc. v. Cloverleaf Healthcare Services, Inc.*, 834 N.E.2d 1116, 1121 (Ind.Ct.App.2005), *reh'g denied, trans. denied* (the contract should be read as a whole and the language construed so as not to render any words, phrases, or terms ineffective). Reading both articles together clearly reveals that after Cincinnati has entered the trial proceedings as the umbrella insurer, it is allowed to appeal even if the underlying insurer chooses not to participate on appeal. Accepting Cincinnati's argument without more would make the duty to defend meaningless because Cincinnati could merely wait until the trial court rules unfavorably to jump into the proceedings on appeal.[6]

Furthermore, we find that the manner in which the lawsuit between Tri–Etch,

Scottsdale, and the Estate was resolved does not affect our preceding analysis. In particular, our review discloses that on January 28, 2005, the parties executed their settlement whereby Tri–Etch and Scottsdale promised to forego an appeal of the judgment entered on January 7, 2005, and Scottsdale agreed to pay the Estate $1,000,000 in exchange for a release from any further claims the Estate may have. Additionally, the Estate agreed not to execute the remainder of the judgment against any assets of Tri–Etch, except for coverage under the Cincinnati insurance policies.

If, as here, the insureds are offered a settlement that effectively relieves them of any personal liability, at a time when their insurance coverage is in doubt, surely it cannot be said that it is not in their best interest to accept the offer. Nor, do we think, can the insurer who is disputing coverage compel the insureds to forego a settlement which is in their best interest. *See Midwestern Indem. Co.*, 119 F.Supp.2d at 839. However, we do recognize that there is a risk that the resulting settlement was not the product of reasonableness or good faith. Nevertheless, the

---

6. We acknowledge that on April 24, 2006, Cincinnati presented us with a Citation of Additional Authority to bolster its argument. In its Citation, Cincinnati refers to our opinion in *Kocher v. Getz*, 844 N.E.2d 1026 (Ind. Ct.App.2006) as evidence that it is preferable for an insurance company to intervene. *Id.* at 1031. We find *Kocher* to be readily distinguishable from the instant case. Throughout Kocher's trial proceedings there was confusion as to who was the catalyst behind the case: Kocher or United Farm, his insurance company. To that effect, the trial court noted that "[t]he ghost in the courtroom is [United Farm] ... but [United Farm] is here and in fact is a party to the case. [T]hey have called all the shots ..." *Id.* at 1031. Unlike here, the parties and their respective positions are clearly delineated: Cincinnati explicitly refused to defend its insured, and instead filed a

declaratory action contesting coverage. After the declaratory action was filed, Cincinnati watched the progress of events, waiting to see what would develop, and only after the end had been reached and the result was found to be unsatisfactory, did the insurer conclude to try his own hand. Furthermore, the dissent in *Kocher* aptly and appropriately pointed out that:

> While acknowledging that it would have been better practice for United Farm to have intervened in this case, the majority's opinion appears to make light of Indiana's Trial Rules....[T]he majority in effect makes Ind. Trial Rule 24, providing for the intervention of parties in an action, worthless and grants insurance companies the tool to ignore rules to which we hold others nonetheless accountable.

*Id.* at 1034–35.

proper place to raise these purported issues of reasonableness and good faith is during an action to determine whether the claim is covered by the policy or during an action to enforce the judgment.

Consequently, based on the evidence before us, we conclude that because Cincinnati filed a declaratory judgment action, the judgment and resulting settlement between Tri–Etch, Scottsdale and the Estate will bind Cincinnati as to the issues not related to coverage, at least so long as Tri–Etch has acted reasonably and in good faith in negotiating and agreeing to the settlement. Accordingly, we find that not only did the trial court abuse its discretion by granting Cincinnati's motion to intervene pursuant to Indiana Trial Rule 24(A)(2), but also that our motions panel erred as a matter of law by denying the Estate's motion to dismiss Cincinnati's appeal. *See Smith,* 834 N.E.2d at 1100; *Herdrich Petroleum Corp.,* 773 N.E.2d at 324.

## CONCLUSION

Based on the foregoing, we conclude that Cincinnati timely filed its notice of appeal, but that the trial court abused its discretion by granting Cincinnati's motion to intervene for purposes of appeal pursuant to Indiana Trial Rule 24(A)(2).

Reversed.

VAIDIK, J., and DARDEN, J., concur.