TRI–ETCH, INC., d/b/a Sonitrol Security Systems of Muncie, Jan Etchison, Nancy Etchison, Ruby Young, as Personal Representative of the Estate of Michael Young, deceased, and Scottsdale Insurance Company, Appellants–Plaintiffs–Cross–Appellees,

v.

CINCINNATI INSURANCE COMPANY, Appellee–Defendant–Cross–Appellant.

No. 49A02–0709–CV–827.

Court of Appeals of Indiana.

July 24, 2008.

James R. Fisher, Debra H. Miller, Miller & Fisher LLC, Indianapolis, IN, Attorneys for Appellants, Tri–Etch, Inc., Jan Etchison, Nancy Etchison, and Ruby Young, Personal Representative of the Estate of Michael Young.

Lloyd H. Milliken, Lucy R. Dollens, Locke Reynolds LLP, Indianapolis, IN, Stacy M. Broman, Jacob S. Woodard, Meagher & Geer, P.L.L.P., Minneapolis, MN, Attorneys for Appellant, Scottsdale Insurance Company.

Richard R. Skiles, Janet M. Prather, Skiles Detrude, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

The case we address today stems from a tragedy that has resulted in nine years of litigation. These parties have been before our court three times and have argued their case before our Supreme Court twice. While the issues we address include complex insurance matters concerning notice, prejudice, policy coverage, and defense costs, no amount of litigation will ever erase the unfortunate circumstances that bring us here today.

Appellants-plaintiffs-cross-appellees Tri–Etch, Inc. (Tri–Etch), Scottsdale Insurance Company (Scottsdale), Jan Etchison, Nancy Etchison, and Ruby Young, as the personal representative of the Estate of Michael Young (the Estate), (collectively, the appellants)[1] appeal the trial court's order granting summary judgment in fa-

---

1. Tri–Etch and the Estate filed a combined brief and Scottsdale filed a separate brief. While the parties argue for the same result and restate many of the same arguments, Scottsdale presents additional issues in its brief regarding a motion it filed seeking one-

half of the defense costs for the liability litigation. For the sake of clarity, we will refer to these parties collectively as "the appellants." However, we will cite Tri–Etch and the Estate's combined brief as "Appellants' Br." and

vor of appellee-defendant-cross-appellant Cincinnati Insurance Company (Cincinnati). Two trial court orders are at issue herein: (1) a partial summary judgment order issued in May 2006 (the First Order), which Cincinnati cross-appeals, and (2) a summary judgment order issued in September 2007 (the Second Order), which the appellants appeal.

The appellants appeal the trial court's Second Order and argue that the trial court erred by granting summary judgment in favor of Cincinnati. They contend that Tri–Etch gave adequate notice of the event resulting in liability under Cincinnati's insurance policies. Alternatively, even if Tri–Etch's notice to Cincinnati was untimely, the appellants argue that it was not unreasonable and did not prejudice Cincinnati as a matter of law. Thus, the appellants request that we reverse the trial court's grant of summary judgment and order the trial court to enter summary judgment in their favor.

Cincinnati cross-appeals the trial court's First Order and argues that it was entitled to summary judgment on the issues of notice, prejudice, and coverage that were raised in the first round of summary judgment motions. Additionally, Cincinnati argues that (1) it should be permitted to pursue an equitable subrogation claim against Scottsdale for Scottsdale's failure to settle within its policy limits, and (2) the trial court erroneously denied its motion to expand the issues for trial.

Scottsdale presents an additional issue, arguing that the trial court erred when it refused to order Cincinnati to reimburse Scottsdale for one-half of the costs Scottsdale incurred defending Tri–Etch during the liability litigation. Alternatively,

Scottsdale argues that it is entitled to be reimbursed for, at a minimum, one-half of the costs it incurred after March 18, 2004—the date on which Cincinnati admits that it received notice of the Estate's claim.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions set forth herein.

## FACTS [2]

### Underlying Facts

While the case currently before us is an insurance coverage dispute, the underlying facts are as follows: in August 1997, Tri–Etch provided security services for Muncie Liquors, Inc. (the store), in Muncie. The store was equipped with several panic buttons, which could be activated at any time. Tri–Etch monitored the security system while it was activated and, in addition, provided a late-to-close service for the store's night alarm. Once the night alarm was set, attempts to enter the store would trigger an alarm at Tri–Etch's central station and the police would be called. If the store's night alarm was not set within a certain amount of time after the usual closing time, Tri–Etch would call the store. If no employee answered, Tri–Etch would notify the store's general manager and then call the police. The store usually closed at midnight and, in the event the alarm was not set by this time, Tri–Etch customarily began calling by 12:30 a.m. Additionally, a Tri–Etch computer generated reports notifying Tri–Etch if the store's night alarm had not been set. A Tri–Etch computer automatically generated late-to-close reports at midnight and 3:00 a.m.

---

will cite Scottsdale's brief as "Scottsdale's Br." The appellants filed a joint appendix.

**2.** We held oral argument in Indianapolis on June 5, 2008. We thank counsel for their presentations.

On August 13, 1997, the store appeared on Tri–Etch's 3:00 a.m. late-to-close report. A Tri–Etch employee called the store but there was no answer. The employee called Chris Johnson, the store's owner, at home at approximately 3:15 a.m. After arriving at the store, Johnson noticed that money had been stolen and that Michael Young, the employee who should have closed the store and set the night alarm, was missing. Johnson called the police, who ultimately found Young at approximately 6:00 a.m., beaten and bound to a tree at a local park. Young died of his injuries later that day.

### The Liability Litigation [3]

At the time of Young's death, Tri–Etch was insured by three insurance policies: (1) a policy issued by Scottsdale with a $1,000,000 limit of liability; (2) a commercial general liability (CGL) policy issued by Cincinnati with a $1,000,000 limit of liability; and (3) an umbrella policy issued by Cincinnati with a $2,000,000 aggregate limit.

The Estate filed a complaint against Tri–Etch on August 6, 1999, alleging that pursuant to a contractual agreement, custom, and practice, Tri–Etch had breached its duty to call the store's general manager if the store's night alarm was not set within thirty minutes of closing. The Estate presented evidence that if Young had been found and treated two to three hours earlier, he could have recovered from his injuries.

The parties dispute when Cincinnati received notice of Young's death and the Estate's resulting lawsuit. Both of Cincinnati's polices provided that Tri–Etch must notify Cincinnati "as soon as practicable" of an "occurrence" that may result in a claim or lawsuit. Appellants' App. p. 2446, 2478. Furthermore, the policies provided that "if a claim is made or a suit is brought against any insured," the insured "must ... [n]otify us as soon as practicable ... [and must i]mmediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" *Id.* at 2446, 2478–79.

Scottsdale retained counsel for Tri–Etch on August 26, 1999. Tri–Etch filed a motion for summary judgment on January 30, 2001, asserting that the Estate's wrongful death action was barred by a one-year limitation contained in the contract the store had with Tri–Etch. The trial court granted summary judgment in Tri–Etch's favor on May 22, 2001, but our Supreme Court ultimately reversed, holding that "[s]ince Young was not a party to the contract, and thus never consented to the terms of the contract, the contract simply does not impose any obligations or limitations on him." *Young v. Tri–Etch, Inc.,* 790 N.E.2d 456, 459 (Ind.2003).

On March 17, 2004, Tri–Etch wrote a letter to Cincinnati, summarizing the liability litigation and informing Cincinnati that

[t]he case is being defended by [Scottsdale] under another policy insuring Tri–Etch, but Tri–Etch notified your Agent when the lawsuit was filed, and Cincinnati refused to defend. The trial is scheduled [to be held in less than three weeks] and we wanted to make you aware again of the lawsuit. We believe there is some risk of a verdict in excess of one million dollars, and that Cincinna-

---

**3.** The litigation regarding Tri–Etch's liability is final and is not at issue in this appeal. We acknowledge that the propriety of the trial court's damages award has never been addressed on its merits on appeal, as will be explained in further detail below. Nonethe-

less, because the liability litigation is final, Tri–Etch is legally obligated to pay damages as a result of the Estate's claim and we cannot question the trial court's damages award because we are bound by the law of the case.

ti would have coverage under the enclosed policies.

Appellants' Br. p. 1576. Cincinnati responded on March 26, 2004, informing Tri–Etch and Scottsdale that

1.   [The March 17 letter] represents the first notice to [Cincinnati that it] is currently able to document. If anyone has documentation or information supporting [the] statement that "Tri–Etch notified [Cincinnati] when the lawsuit was filed, and Cincinnati refused to defend," please contact me immediately.

\* \* \*

3.   Due to the timing of this notice, [Cincinnati] is disadvantaged both in conducting a coverage analysis and in analyzing liability and defense regarding the underlying suit. . . .

4.   Insofar as it may owe excess or umbrella coverage over Tri–Etch's policy with [Scottsdale], [Cincinnati] hereby instructs [Scottsdale] to settle all of [the Estate's] claims within [Scottsdale's] policy limits if, and as soon as possible, [the Estate] will accept a settlement within Scottsdale's policy limits. [Cincinnati] reserves the right to raise all claims, duties and defenses as against [Scottsdale].

Appellants' App. p. 1578.

At some point during March 2004, Cincinnati determined that the Estate's claim against Tri–Etch was not covered by either of Cincinnati's policies. Id. at 2031. Thus, on April 2, 2004, Cincinnati filed a declaratory judgment action in the United States District Court for the Southern District of Indiana, seeking, in part, a declaration that it owed no duty to defend or indemnify Tri–Etch in the liability litigation.

The first jury trial regarding the Estate's complaint against Tri–Etch was held from April 5 until April 8, 2004; however, the trial court granted a mistrial after the jury indicated that it was unable to reach a verdict. A second jury trial was held from December 6 until December 10, 2004, and the jury found in favor of the Estate and awarded it $2,500,000 in damages. It found Tri–Etch to be 40% at fault and Michael Moore, the non-party who attacked Young, to be 60% at fault.

On December 28, 2004, the Estate moved to enter the entire judgment amount against Tri–Etch, arguing that Tri–Etch's "business and profession is to provide protection against criminal activity, for profit." Id. at 506. On January 7, 2005, the trial court granted the Estate's motion and entered judgment against Tri–Etch for the full amount—$2,500,000.

Tri–Etch filed a motion to correct error on January 10, 2005. On January 21, 2005, the Estate notified Cincinnati in writing that Tri–Etch and Scottsdale had reached a settlement agreement providing that Scottsdale, as Tri–Etch's primary insurer, would pay its $1,000,000 policy limit to the Estate and that the Estate would agree to limit execution of the unpaid judgment balance to proceeds from Cincinnati's policies. The agreement specifically provided Cincinnati with the opportunity to reconsider its previous denial of coverage and assume control of the defense, including the right to pursue an appeal on behalf of Tri–Etch. Tri–Etch alerted Cincinnati that if it did not pursue an appeal, Tri–Etch would withdraw its motion to correct error and consummate its agreement with the Estate not to appeal from the adverse judgment.

Tri–Etch withdrew its motion to correct error on February 2, 2005, and, the same day, Cincinnati moved to intervene in the liability litigation for purposes of appealing the judgment in its own name only. The next day, Cincinnati reaffirmed to Tri–Etch that it would not acknowledge cover-

age under either of its insurance policies. The trial court granted Cincinnati leave to intervene on February 17, 2005, and Cincinnati filed its notice of appeal.

On April 7, 2005, the Estate filed a motion with our court to dismiss Cincinnati's appeal, arguing that Cincinnati had no right to intervene in its own name to appeal the judgment against Tri–Etch. We denied the Estate's request for dismissal on June 9, 2005. On appeal, we held that when an insurer reserves its right to deny coverage or files a declaratory judgment action, an insurer's interest in the liability litigation is contingent and precludes its standing to intervene. Thus, we concluded that

> because Cincinnati filed a declaratory judgment action, the judgment and resulting settlement between Tri–Etch, Scottsdale and the Estate will bind Cincinnati as to the issues not related to coverage, at least so long as Tri–Etch has acted reasonably and in good faith in negotiating and agreeing to the settlement. Accordingly, we find that not only did the trial court abuse its discretion by granting Cincinnati's motion to intervene pursuant to Indiana Trial Rule 24(A)(2), but also that our motions panel erred as a matter of law by denying the Estate's motion to dismiss Cincinnati's appeal.

*Cincinnati Ins. Co. v. Young,* 852 N.E.2d 8, 17 (Ind.Ct.App.2006), trans. denied. Cincinnati sought transfer and, after hearing oral argument, our Supreme Court denied transfer by a vote of three to two. *Cincinnati Ins. Co. v. Young,* 869 N.E.2d 450 (Ind.2007) (Sullivan, J., and Boehm, J., voting to grant transfer).

### *Insurance Coverage Litigation*

While the liability litigation was proceeding through our state system, Scottsdale filed a motion to dismiss Cincinnati's federal declaratory judgment action on May 20, 2005, arguing that the federal court lacked subject matter jurisdiction. Scottsdale's motion was granted on June 23, 2005, and Cincinnati's federal action was dismissed without prejudice.

On May 20, 2005, the appellants filed a complaint against Cincinnati in the Marion Superior Court. The Estate demanded judgment against Cincinnati in the amount of $1,500,000 plus post-judgment interest, Tri–Etch and the Estate demanded judgment against Cincinnati for compensatory and punitive damages, and Scottsdale demanded judgment against Cincinnati "for the amounts that Cincinnati owes for defense and indemnity with respect to the [liability] lawsuit." Appellants' App. p. 1007. Cincinnati answered on June 16, 2005, and filed a counterclaim against Scottsdale, arguing that if the trial court found Cincinnati to be liable under the umbrella policy, Scottsdale could be liable to Cincinnati for failing to settle the Estate's claim within Scottsdale's primary limits to avoid excess exposure.

The appellants moved for summary judgment on December 6, 2005, and January 20, 2006, arguing that there were no genuine issues of material fact. Cincinnati responded and, on March 1, 2006, filed a cross-motion for summary judgment. A hearing was held on April 24, 2006, and on May 3, 2006, the Honorable Cale Bradford issued the First Order, granting partial summary judgment in favor of the appellants:

> 1. On the bad faith counter claim brought by [Cincinnati] against [Scottsdale], the Court now grants Summary Judgment to [Scottsdale] and against [Cincinnati]. The Court further denies [Cincinnati's] Motion for Summary Judgment on its bad faith claim.
> 2. The Court now grants Partial Summary Judgment to the [appellants], find-

ing that the events of August 12, 1997 are covered in the [CGL and umbrella policies]. The Court denies [Cincinnati's] Motion for Summary Judgment on this coverage issue.

3. The Court finds there is a genuine issue of material fact as to whether Tri–Etch gave proper notice to [Cincinnati] and if notice was not given, did [Cincinnati] suffer prejudice. For this reason the balance of [the appellants'] Motion for Summary Judgment and [Cincinnati's] Motion for Summary Judgment is denied.

4. The Court denies [Scottsdale's] and [Cincinnati's] Motions for Summary Judgment concerning [Scottsdale's] claim to recover 50% of the legal fees and costs [Scottsdale] paid to defend Tri–Etch in the [liability litigation] which arose from the events of August 12, 1997 due to genuine issues of material fact outlined in paragraph three above.

*Id.* at 1499. Cincinnati filed a motion with our court to accept jurisdiction of an interlocutory appeal, but we denied that motion on August 15, 2006. Cincinnati now cross-appeals the First Order.

On May 30, 2007, the appellants filed a motion for partial summary judgment "with respect to the 'Late Notice' and 'Prejudice' affirmative defenses of Cincinnati under its umbrella policy." *Id.* at 1505. On August 9, 2007, Cincinnati responded and filed a cross-motion for summary judgment, arguing that because it was prejudiced by Tri–Etch's late notice, the trial court should grant Cincinnati summary judgment and rule that it does not owe coverage, indemnity, or a defense obligation under either the CGL or umbrella policies.

On September 7, 2007, the Honorable David Shaheed issued the Second Order, granting summary judgment in favor of Cincinnati and ordering that

> Tri–Etch's notice to Cincinnati was unreasonably late as a matter of law. . . . As a matter of law, Cincinnati was prejudiced by the untimely notice. . . . Due to the prejudice arising from untimely notice, Cincinnati owes no coverage, indemnity, or defense obligation under either its CGL or umbrella policy.

\* \* \*

> As an evidentiary matter, the timing of the notice negates Scottsdale's claim to recover one-half of the attorneys fees incurred since the inception of the underlying [liability litigation]. Further, one could not determine a dollar amount of fees incurred subsequent to notice to Cincinnati under the designated evidence.

*Id.* at 41–42. Based on these conclusions, the trial court ordered that summary judgment be entered in favor of Cincinnati and against the appellants. The appellants now appeal the Second Order.

## DISCUSSION AND DECISION

### I. Language in Cincinnati Policies

Both of Cincinnati's policies contain two types of notice provisions—an occurrence notice provision and a claim notice provision. The occurrence notice provision provides that Tri–Etch must notify Cincinnati "as soon as practicable" of an "occurrence" that may result in a claim or lawsuit. Appellants' App. p. 2446, 2478. The claim notice provision provides that "if a claim is made or a suit is brought against any insured," the insured "must . . . [n]otify us as soon as practicable . . . [and must i]mmediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" *Id.* at 2446, 2478–79. The umbrella policy's claim notice provision adds the

words "[i]f a claim is made ... that is *likely to involve this policy*" to the requirement. *Id.* at 2478 (emphasis added).

The parties dispute when Tri–Etch notified Cincinnati of Young's death and the Estate's claim and whether such notice was timely. In sum, Tri–Etch argues that it provided notice shortly after the incident and, additionally, notified Cincinnati of the Estate's complaint when the liability litigation began in 1999. However, Cincinnati argues that Tri–Etch did not notify it about Young's death or the resulting litigation until Tri–Etch sent it a letter on March 17, 2004—more than six years after Young's death and more than four years after the Estate filed its complaint. Cincinnati contends that this notice was untimely and unfairly prejudicial.

## II. The Second Order

We will first address the appellants' appeal of the trial court's Second Order because, if resolved in favor of Cincinnati, Cincinnati's cross-appeal would be moot. The appellants argue that the trial court erred when it concluded that Tri–Etch had not provided timely notice to Cincinnati, prejudicing the insurance company. Our standard for reviewing a trial court's grant of summary judgment is well-settled:

> Summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. A party seeking summary judgment bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. A factual issue is "genuine" if it is not capable of being conclusively foreclosed by reference to undisputed facts. Although there may be genuine disputes over certain facts, a fact is material

when its existence facilitates the resolution of an issue in the case.

> When we review a trial court's entry of summary judgment, we are bound by the same standard that binds the trial court. We may not look beyond the evidence that the parties specifically designated for the motion for summary judgment in the trial court. We must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmovant, and resolve all doubts against the moving party. However, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity on appeal. A party appealing from an order granting summary judgment has the burden of persuading us that the decision was erroneous.

*Plaza Group Prop., LLC v. Spencer County Plan Comm'n,* 877 N.E.2d 877, 883–84 (Ind.Ct.App.2007), *trans. denied* (citations omitted). We may affirm the trial court's grant of summary judgment upon any basis that the record supports. *Hoesman v. Sheffler,* 886 N.E.2d 622, 626 (Ind.Ct.App. 2008).

As previously noted, the parties dispute when Tri–Etch alerted Cincinnati of Young's death and the resulting lawsuit. Cincinnati asks us to find Tri–Etch's notice unreasonably late as a matter of law and affirm the trial court's summary judgment order on this basis. However, regardless of when Cincinnati received notice of Young's death and the Estate's lawsuit, Cincinnati has always contended that Young's death was not an "occurrence" entitled to coverage under its policies. Thus, we first must discern whether Cincinnati can show that it was prejudiced by Tri–Etch's allegedly faulty notice.

In *Miller v. Dilts,* our Supreme Court held that an insurer may not avoid liability under a policy's cooperation and

notice clauses unless the insured's non-compliance with those clauses resulted in actual prejudice. 463 N.E.2d 257, 265–66 (Ind.1984). When an insured fails to provide its insurer with timely notice of an occurrence, we apply a two-part test. First, we inquire whether the insured notified the insurer within a reasonable amount of time. Second, we determine whether the insurer suffered prejudice as a result of the delay. If notice was not tendered in a reasonable amount of time, there is a rebuttable presumption that the insurer was prejudiced. *Id.* at 266.

Other jurisdictions have held that an insured can rebut this presumption of prejudice regarding late notice by showing that the insurance company would have denied coverage on unrelated grounds even if the notice had been timely. In *Fireman's Fund Ins. Co. v. Bradley Corp.,* the Wisconsin Supreme Court affirmed the trial court's grant of summary judgment in favor of the insured based on evidence that the insurance company's litigation manager attested that, notwithstanding the insured's notification delay of almost fifteen months, the insurance company would still have denied coverage had it been provided timely notice of the lawsuit. 261 Wis.2d 4, 660 N.W.2d 666, 683 (2003). Based on this evidence that "the timing of Bradley's notice would not have changed the Insurance Company's decision to deny its duty to defend," the *Fireman's Fund* court concluded "as a matter of law that the Insurance Company suffered no prejudice." *Id.*

Other jurisdictions have reached similar conclusions. *See Nat'l Am. Ins. Co. v. Certain Underwriters,* 93 F.3d 529 (9th Cir.1996) (holding that when an insurer denies coverage on grounds unrelated to late notice, a strong presumption arises that the insurer has not suffered prejudice from the late notice); *Zurich Ins. Co. v. Sunclipse, Inc.,* 85 F.Supp.2d 842, 851

(N.D.Ill.2000) (holding that if an insurer denies coverage based on an assertion that the underlying claim is excluded from coverage, there is a presumption that the insurer did not suffer prejudice "because prompt notice would have merely resulted in an earlier denial of coverage"); *Strickler v. Huffine,* 421 Pa.Super. 463, 618 A.2d 430, 435 (1992) (holding that in light of evidence that the insurer would have denied coverage even if it had received suit papers on a timely basis, the insurer could not show prejudice).

■ We will assume for the sake of the argument that Tri–Etch did not notify Cincinnati of the Estate's claim until March 2004 and that this notice was unreasonably late. Although unreasonable delay leads to a presumption of prejudice in favor of Cincinnati, Tri–Etch can rebut this presumption. *Miller,* 463 N.E.2d at 266.

In the declaratory judgment action that Cincinnati filed in federal court on April 2, 2004, Cincinnati alleged that it owed no duty to defend or indemnify Tri–Etch because "there was no 'occurrence' as required for Coverage" under either Cincinnati's CGL or umbrella policies. Appellants' App. p. 583. While Cincinnati included Tri–Etch's allegedly late notice as an alternative basis for relief, nineteen of Cincinnati's twenty proposed bases for relief focused on Cincinnati's belief that the Estate's action did not constitute an "occurrence" entitled to coverage under either of Cincinnati's policies. *Id.* at 582–85.

Furthermore, Cincinnati filed admissions with the trial court in April 2007, acknowledging that "[a]t all relevant times, Cincinnati has asserted, and continues to assert, that the Young claims against Tri–Etch are not covered under the Cincinnati policies, and that Cincinnati did not owe a defense to Tri–Etch against such claims." *Id.* at 2031.

Cincinnati has maintained this position throughout the pendency of this lengthy litigation. In fact, Cincinnati spills a significant amount of the ink in its brief on cross-appeal arguing that Tri–Etch is not entitled to coverage because the Estate did not sue for an "occurrence" under either the CGL or umbrella policies. Appellee's Br. p. 56–69. We fail to see how Cincinnati was prejudiced by Tri–Etch's allegedly late notice when it has consistently maintained that Tri–Etch is not entitled to coverage under either of its policies for the claim resulting from Young's death. Moreover, at oral argument, Cincinnati's counsel was unable to direct us to anything Cincinnati would have done differently had it received timely notice. While focusing on significant stages of the litigation that had already passed, counsel did not deny that Cincinnati has consistently maintained that its policies do not cover Tri–Etch against the Estate's claim for reasons wholly unrelated to the alleged violation of the notice provisions.

Our conclusion is strengthened by David Cunningham's deposition, which Tri–Etch designated during the second round of summary judgment motions. Cunningham was the regional casualty claims manager for Cincinnati and had worked for the insurance company for twenty-two years. *Id.* at 1671. Cincinnati designated Cunningham to speak on its behalf pursuant to Rule of Trial Procedure 30(B)(6), and the following colloquy took place during that deposition:

Q. [Appellants' Counsel:] Who on behalf of Cincinnati made the decision to deny coverage?

A. [Cunningham:] Me.

Q. Why?

A. I beg your pardon?

Q. Why did you deny coverage?

A. I think that's clearly outlined in our declaratory judgment action.

* * *

Q. [Appellants' Counsel:] Apart from the late notice issues which Cincinnati has based its denial of coverage on, you are aware that there were other reasons that Cincinnati was denying coverage and decided for file the [declaratory judgment action], were you not?

A. [Cunningham speaking after counsel's objection to form of the question:] Yes.

Q. My question is this: Had Cincinnati received notice of this claim or lawsuit shortly after the lawsuit was filed in 1999, would the reasons for denying coverage, apart from the late notice issue, which would not have existed, have been the same?

A. Same policy exclusions were in force at the time, *yes.*

Q. So they would have been the same?

A. *Correct.*

Appellants' App. p. 1701–02; 1730–31 (emphases added). This admission that Cincinnati would have denied coverage even if it had been timely notified of the Estate's claim reinforces our conclusion that Cincinnati was not prejudiced by Tri–Etch's allegedly late notice.

In sum, because Cincinnati has consistently maintained that Tri–Etch is not entitled to coverage under either the CGL or umbrella policies because it does not believe that the Estate's claim constitutes an "occurrence" entitled to coverage, we fail to see how Cincinnati has been prejudiced as a matter of law by Tri–Etch's allegedly late notice. Thus, we reverse the trial court's grant of summary judgment in favor of Cincinnati in the Second Order and remand with instructions to enter summary judgment in favor of the appellants

on Cincinnati's affirmative defenses.[4]

## CINCINNATI'S CROSS–APPEAL

### I. The First Order

In light of our decision to reverse the trial court's Second Order, we now turn to Cincinnati's cross-appeal. In the First Order, the trial court granted partial summary judgment in favor of the appellants after finding that "the events of August 12, 1997 are covered in the [CGL and umbrella policies]." Appellants' App. p. 1499. Cincinnati maintains that the trial court erred and that, instead, it was entitled to summary judgment on the coverage issues because "the Estate did not sue Tri–Etch for an 'Occurrence' or Accident" as defined by the policies.[5] Appellee's Br. p. 56.

The standard of review for interpreting insurance contracts is well settled:

> Generally, the interpretation of an insurance policy presents a question of law and is thus appropriate for summary judgment. A contract for insurance is subject to the same rules of interpretation as are other contracts. If the language in the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning, but if the language is ambiguous, the insurance contract should be strictly construed against the insurance company.
>
> This is especially true where the policy language in question concerns an exclusion clause. When an insurance company fails to clearly exclude that which the insured attempted to protect against, we must construe the ambigu-

ous policy to further the policy's basic purpose of indemnity. A policy is ambiguous only if it is susceptible to more than one interpretation and reasonably intelligent persons would differ as to its meaning.

*Hartford Cas. Ins. Co. v. Evansville Vanderburgh Pub. Library,* 860 N.E.2d 636, 640 (Ind.Ct.App.2007) (citations omitted), *trans. denied.*

### A. CGL Policy Coverage

■ Cincinnati argues that its CGL policy does not cover Tri–Etch for liability incurred as a result of the Estate's claim. Specifically, Cincinnati emphasizes that the Estate sued Tri–Etch for causes of action based on negligence and breach of contract,[6] not for an "occurrence" as defined in the policy. Cincinnati's CGL policy provides:

SECTION I—COVERAGES

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. [Cincinnati] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. . . .

b. This insurance applies to "bodily injury" and "property damage" only if

---

4. Because we reverse the trial court's Second Order, we need not address the appellants' argument that the trial court improperly relied upon inadmissible post-deposition affidavits to reach its decision.

5. We need not address Cincinnati's arguments related to the issues of notice and prej-

udice in light of our holding regarding the Second Order.

6. The case was ultimately tried to the jury on a common law negligence theory. Appellants' Reply Br. p. 31.

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"....

Appellee's Addendum p. 10. The CGL policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 14.

The gravamen of Cincinnati's argument is that the Estate's claim did not implicate the CGL policy because Tri–Etch was not sued for an accident. Cincinnati emphasizes that the Estate's complaint alleged that Tri–Etch was negligent for not calling the store manager at 12:30 a.m. and, instead, waiting to call him after the store showed up on the 3:00 a.m. late-to-close report. Put another way, Cincinnati contends that "Tri–Etch was sued for a business act[,]" not an accident. Appellee's Br. p. 60.

■ "[I]n the context of insurance coverage, an accident means an unexpected happening without an intention or design." *Auto–Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1283 (Ind.2006). "[I]mplicit in the meaning of 'accident' is the lack of intentionality." *Id.* Our Supreme Court recognized that

> [t]his description is consistent with the plain meaning of "accident," as indicated by the primary definition provided in several modern dictionaries: "1. an unintentional or unexpected happening that is undesirable or unfortunate, esp. one resulting in injury, damage, harm, or loss," The *Random House College Dictionary* 9 (1984); "1. a: an unforeseen and unplanned event or circumstance b: lack of intention or necessity," *Webster's Ninth New College Dictionary* 49 (1987); "1. An unexpected and undesirable event. 2. Something that occurs unexpectedly or unintentionally," The *American Heritage Dictionary* 71 (2d ed.1985).

*Id.*

The Estate's claim was based on Tri–Etch's failure to call the store by 12:30 a.m. to alert it that the alarm had not been set. While this service was not described in the parties' contract, our Supreme Court noted that it was "an additional service" that Tri–Etch provided to the store "customarily" by 12:30 a.m. *Young*, 790 N.E.2d at 457. The Estate's complaint against Tri–Etch was based on its belief that if Tri–Etch had called the store's manager by 12:30 a.m., "Michael Young would either not have been injured at all, or would have been located and lifesaving medical treatment would have been available to him before his injuries became life threatening, and then fatal." Appellants' App. p. 426.

No party has ever alleged that Tri–Etch knowingly or intentionally failed to call the store within thirty minutes of closing. Instead, the central tenet of the Estate's claim has always been that Tri–Etch's oversight played a role in Young's untimely death. This unintentional oversight was "an unexpected happening without an intention or design." *Harvey*, 842 N.E.2d at 1283. In other words, it was an accident. Because it is undisputed that Tri–Etch did not intentionally fail to call the store within thirty minutes of closing and Tri–Etch is legally obligated to pay damages resulting from Young's bodily injury and death, we conclude that Tri–Etch is entitled to coverage pursuant to Cincinnati's CGL policy as a matter of law.

### B. Umbrella Policy Coverage

■ Cincinnati's umbrella policy provides:

SECTION I—COVERAGES

We will pay on behalf of the insured the "ultimate net loss" which the insured is

legally obligated to pay as damages in excess of the "underlying insurance" or for an "occurrence" covered by this policy which is either excluded or not covered by "underlying insurance" because of:

    1. "Bodily injury" or "property damage" covered by this policy occurring during the policy period and caused by an "occurrence"; ...

* * *

SECTION V—DEFINITIONS

* * *

    9. "Occurrence" means:

    a. An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage"....

    b. An offense that results in "personal injury" or "advertising injury". All damages that arise from the same act, publication or general conditions shall be deemed to arise from one "occurrence"....

Appellee's Addendum p. 15, 20–21 (emphasis added).

Cincinnati does not address the language from the umbrella policy that we have emphasized above and, instead, contends that "no coverage was implicated under the umbrella policy for the same reason [as the CGL policy]." Appellee's Br. p. 64. Specifically, Cincinnati reiterates its belief that Tri–Etch was not sued for an "occurrence." *Id.* at 65. We need not address this argument because we have already rejected that rationale.

Instead, we find the dispositive language in Cincinnati's umbrella policy to be the language preceding the disjunctive word "or" in the first paragraph of the coverage section of the policy. This language unambiguously provides that Cincinnati will pay on behalf of Tri–Etch if Tri–Etch is legally obligated to pay damages in excess of an underlying insurance policy. The first page of the umbrella policy specifically lists Cincinnati's CGL policy as an underlying insurance policy. Appellee's App. p. 38. And we have already determined that Tri–Etch was entitled to coverage pursuant to the underlying CGL policy.

As previously detailed, Tri–Etch was found liable for $2,500,000 in damages as a result of the liability litigation. Tri–Etch settled with Scottsdale for Scottsdale's policy limit—$1,000,000—and is currently pursuing coverage for the remaining amount of damages—$1,500,000—from Cincinnati. Cincinnati's CGL policy has a $1,000,000 limit and its umbrella policy has a $2,000,000 aggregate limit. Because Tri–Etch is still legally obligated to pay $1,500,000 in damages and this amount is $500,000 more than the underlying CGL policy limit, the umbrella policy explicitly provides that Cincinnati will pay the excess amount of damages. Thus, Tri–Etch is entitled to coverage for that amount pursuant to the umbrella policy as a matter of law.[7]

---

**7.** Cincinnati raises two additional issues on cross-appeal. First, Cincinnati argues that Scottsdale breached a duty to Cincinnati by not settling within its policy limits, thereby implicating Cincinnati's umbrella policy. Specifically, Cincinnati contends that it ordered Scottsdale to settle the Estate's claim within its policy limits and that Cincinnati accrued a cause of action against Scottsdale when Scottsdale did not do so. Therefore, Cincinnati asks that we remand and allow Cincinnati to pursue an equitable subrogation claim against Scottsdale. However, by Cincinnati's own admission, its cause of action hinges upon us holding that Cincinnati "owe[s] an indemnity payment for the Estate's claim under the Cincinnati umbrella policy and not under the Cincinnati CGL poli-

## II. Coverage Conclusion

Regarding Cincinnati's coverage-related cross-appeal, we have concluded that Tri–Etch was entitled to coverage pursuant to Cincinnati's CGL and umbrella policies. Thus, we remand to the trial court with instructions to enter summary judgment in favor of the appellants on the coverage issues and order Cincinnati to indemnify Tri–Etch for the remaining damages Tri–Etch is obligated to pay as a result of the Estate's claim—$1,500,000.

## SCOTTSDALE'S MOTION FOR DEFENSE COSTS

Cincinnati's CGL and umbrella policies both contain duty to defend provisions. Appellants' App. p. 2440, 2475. Scottsdale petitioned the trial court to grant summary judgment on its motion for one-half of the costs it incurred defending Tri–Etch during the liability litigation. The trial court denied Scottsdale's motion in the Second Order in light of its decision to grant summary judgment in Cincinnati's favor on the notice and prejudice issues. Additionally, the trial court noted that "one could not determine a dollar amount of fees incurred subsequent to notice to Cincinnati under the designated evidence." *Id.* at 41–42. Scottsdale appeals the trial court's denial of its motion.

■■■ An insurance company's duty to defend is broader than its duty to indemnify. *Walton v. First Am. Title Ins. Co.,* 844 N.E.2d 143, 146 (Ind.Ct.App.2006), *trans. denied.* When an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by

the policy, the insurer may properly refuse to defend. *Id.* An insurer that refuses to defend " 'does so at its peril....' " *Id.* (quoting *Cincinnati Ins. Co. v. Mallon,* 409 N.E.2d 1100, 1105 (Ind.Ct.App.1980)).

■■■ We have already concluded that the Estate's claim against Tri–Etch is covered by Cincinnati's CGL and umbrella policies and that Cincinnati must indemnify Tri–Etch for the remaining amount of damages from the Estate's claim—$1,500,000. Because we have concluded that coverage existed under Cincinnati's policies, each of which contained duty-to-defend provisions, it logically follows that Cincinnati must pay a portion of the costs Scottsdale incurred while defending Tri–Etch during the liability litigation.

However, determining the amount of defense costs Cincinnati should pay is not straightforward. As emphasized numerous times, the parties fervently disagree about when Cincinnati received notice of Young's death and the resulting lawsuit. And we have not directly addressed the notice issue, inasmuch as we resolved the issues regarding Cincinnati's affirmative defenses by holding that it did not matter when Cincinnati received notice for purposes of those arguments because Cincinnati could not show that it was prejudiced by Tri–Etch's allegedly late notice.

Furthermore, there has never been a determination of what constituted reasonable defense costs, which is a question of fact. On remand, Scottsdale should present detailed evidence regarding its defense costs and the dates on which those costs were incurred. Because of the unique posturing of this case and the parties' dis-

cy." Appellee's Br. p. 71, 72. In light of our conclusion that Tri–Etch is entitled to coverage under both of Cincinnati's policies, we need not address this argument.

Second, Cincinnati asserts that "if any coverage issues are remanded for trial, Cincinnati's

motion to expand the issues for trial should be granted." *Id.* at 73. Because we have not remanded any coverage issues for trial, we need not address this argument.

puted evidence regarding when Cincinnati received notice of Young's death and the Estate's lawsuit, the trial court also must determine when Cincinnati received notice for the purpose of determining the amount of reasonable defense costs Cincinnati should pay. If the trial court determines that Cincinnati promptly received notice, as the appellants contend, then the trial court should order Cincinnati to pay one-half of the reasonable defense costs that Scottsdale incurred defending Tri–Etch during the entirety of the liability litigation. Alternatively, if the trial court determines that Cincinnati did not receive notice until March 2004, as Cincinnati contends, then the trial court should order Cincinnati to pay one-half of the reasonable defense costs that Scottsdale incurred defending Tri–Etch during the liability litigation from March 2004 onward.

## CONCLUSION

After immersing ourselves in the record on appeal, we find that the trial court erred by granting summary judgment in favor of Cincinnati in the Second Order because Cincinnati cannot show that it was prejudiced by Tri–Etch's allegedly late notice as a matter of law. Thus, we reverse the trial court on this issue and remand with instructions to enter summary judgment in favor of the appellants regarding Cincinnati's affirmative defenses.

Turning to Cincinnati's cross-appeal, after analyzing the language of Cincinnati's CGL and umbrella policies, we conclude that Tri–Etch is entitled to coverage pursuant to both of those policies as a matter of law. Thus, we remand to the trial court with instructions that it enter summary judgment in favor of the appellants on the coverage issues and order Cincinnati to indemnify Tri–Etch for the remaining damages Tri–Etch is obligated to pay as a result of the liability litigation—$1,500,000.

Turning to Scottsdale's motion for defense costs, we remand for the trial court to determine reasonable defense costs and when Cincinnati received notice for the purpose of ordering Cincinnati to pay one-half of the reasonable defense costs Scottsdale incurred defending Tri–Etch during the liability litigation from that date onward.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

RILEY, J., and ROBB, J., concur.