ATTORNEYS FOR APPELLANTS
James R. Fisher
Debra H. Miller
Indianapolis, Indiana

Stacy M. Broman
Jacob S. Woodard
Minneapolis, Minnesota

Lloyd H. Milliken
Lucy R. Dollens
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Richard R. Skiles
Janet M. Prather
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
PROPERTY CASUALTY INSURERS
ASSOCIATION OF AMERICA
Karl L. Mulvaney
Martha S. Hollingsworth
Barry C. Cope
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INSURANCE INSTITUTE OF INDIANA, INC.
John C. Trimble
Richard K. Shoultz
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
COMPLEX INSURANCE CLAIMS
LITIGATION ASSOCIATION
Laura A. Foggan
Benjamin J. Theisman
Washington, DC

Michael A. Dorelli
Patrick J. Olmstead, Jr.
Jason L. Fulk
Indianapolis, Indiana

FILED

Jul 21 2009, 12:06 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 49S02-0901-CV-8

TRI-ETCH, INC., D/B/A SONITROL SECURITY
SYSTEMS OF MUNCIE; JAN ETCHISON; NANCY
ETCHISON; RUBY YOUNG, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF MICHAEL
YOUNG, DECEASED; AND SCOTTSDALE INSURANCE
COMPANY,

*Appellants/Cross-Appellees*
*(Plaintiffs below),*

v.

CINCINNATI INSURANCE COMPANY,

*Appellee/Cross-Appellant*
*(Defendant below).*

_____

Appeal from the Marion Superior Court, No. 49D01-0505-CT-019704
The Honorable Cale Bradford, Judge
The Honorable David Shaheed, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0709-CV-827

_____

**July 21, 2009**

**Boehm, Justice.**

We hold that an alarm company's commercial general liability and umbrella insurance policies do not cover a claim against the alarm company for delays in observing or reacting to a failure of the retailer to make a scheduled setting of a night alarm. The claim does not arise from an "occurrence" as defined by the policy, and is also within an exclusion for "alarm services."

We also hold that, standing alone, the fact that an insurer also denies coverage on other issues does not preclude the insurer from raising failure to give timely notice of a claim, and does not conclusively rebut the presumption that untimely notice of a claim prejudices the insurer.

**Facts and Procedural History**

On August 12, 1997, Michael Young was employed as a clerk in a liquor store in Muncie, Indiana. Shortly before the store's midnight closing time, Young was abducted by a robber, tied to a tree in a local park, and beaten. At 3:00 a.m. the next morning, the store's security service generated a report showing that the store's night alarm had not been set at midnight as scheduled. The store's general manager was called and arrived at the store at about 3:30 a.m. to find that money and Young were missing. Young was located at 6:00 a.m., still alive and tied to the tree, but he died of his injuries later that day.

In August 1999, Young's Estate brought a wrongful death action against Tri-Etch, Inc., the operator of the store's security service under the brand name Sonitrol. The complaint alleged

2

that Tri-Etch breached a duty to notify the store's manager within thirty minutes of closing if the night alarm had not been set, and that if Tri-Etch had acted promptly, Young would have been found earlier and would have survived. After extensive procedural skirmishing, the case was dismissed based on a contractual one-year limitations provision in the agreement between Tri-Etch and the store. We ultimately reversed that judgment and remanded for trial. Young v. Tri-Etch, Inc., 790 N.E.2d 456, 459 (Ind. 2003). After a mistrial, a $2.5 million jury verdict was entered against Tri-Etch, Inc. in December 2004.

This case addresses the coverage of the Estate's claim under three insurance policies Tri-Etch held at the time of Young's death. Scottsdale Insurance Company had issued a commercial general liability (CGL) policy through the Sonitrol Dealers Association of which Tri-Etch was a member. This policy included errors and omissions coverage for "Alarm Installation and Monitoring" with a $1 million limit of liability. Tri-Etch had a second CGL policy from Cincinnati Insurance Company, also with a $1 million limit, but without an errors and omissions rider. An umbrella or excess policy from Cincinnati had an added $2 million limit above "underlying policies."

One issue in this coverage dispute is whether Tri-Etch gave Cincinnati timely notice of the claim. Tri-Etch notified Scottsdale promptly after the wrongful death suit was filed, and Scottsdale undertook Tri-Etch's defense in 1999. The parties dispute when and how Tri-Etch notified Cincinnati. The documentary evidence does not establish notice to Cincinnati until March 2004, but some of the designated deposition and interrogatory answers claimed earlier notice and denial of coverage. In April 2004, Cincinnati filed a declaratory judgment action in federal court that ultimately was dismissed for lack of diversity jurisdiction. After the verdict in the wrongful death case in December 2004, Scottsdale tendered its $1 million policy limits, and in January 2005 Tri-Etch settled with the Estate by assigning its claims against Cincinnati to the Estate. In February 2005, Cincinnati attempted to intervene in the wrongful death case to file a motion to correct errors and appeal the judgment, but that effort was unsuccessful. Cincinnati Ins. Co. v. Young, 852 N.E.2d 8, 17 (Ind. Ct. App. 2006), trans. denied.

3

In May 2005, the Estate, Tri-Etch,[1] and Scottsdale filed this action against Cincinnati. The Estate sought the unpaid $1.5 million balance of the wrongful death judgment plus post-judgment interest. Scottsdale requested a declaratory judgment that under both of Cincinnati's policies, Cincinnati owed Tri-Etch a defense and coverage for the wrongful death judgment. Scottsdale sought contribution from Cincinnati for Scottsdale's costs of Tri-Etch's defense and the $1 million judgment it had paid.

Cincinnati answered and counterclaimed, seeking a declaratory judgment that it owed no duty to defend or indemnify Tri-Etch against the wrongful death claim because (1) Young did not die as a result of an "occurrence" covered by its CGL or umbrella policy, (2) the umbrella policy excluded claims based on Tri-Etch's alarm services, and (3) Tri-Etch failed to provide timely notice as required by both policies.

All parties moved for summary judgment. The trial court first granted partial summary judgment in favor of the Estate and Scottsdale. The trial court ruled that the Estate's claim against Tri-Etch was covered by Cincinnati's CGL and umbrella policies, but there were genuine issues of material fact as to whether Tri-Etch had provided timely notice and whether Cincinnati suffered any prejudice from delayed notice. After that ruling, the Estate and Scottsdale moved for partial summary judgment to eliminate Cincinnati's defense based on failure to give notice of the claim. Cincinnati responded with a cross-motion for summary judgment that it had no liability under either of its policies because of late notice. The trial court granted summary judgment in favor of Cincinnati, concluding that Tri-Etch's notice to Cincinnati was unreasonably late, Cincinnati was prejudiced by the late notice, and Cincinnati therefore owed no coverage, indemnity, or defense obligation under either its CGL or umbrella policy.

The Estate and Scottsdale appealed the grant of summary judgment to Cincinnati, and Cincinnati cross-appealed the partial summary judgment to the Estate and Scottsdale. The Court

---

[1] The policies principally involved in this case seem to insure only Tri-Etch, Inc. The complaint alleges that Jan and Nancy Etchison, also plaintiffs in this case, are the sole owners of Tri-Etch, Inc., and also assigned whatever interest they have in the policies. The excess policy issued to Tri-Etch, Inc. included a personal excess liability rider for excess coverage of claims under the Etchisons' homeowners and auto policies. This personal rider had an exclusion for "business." No separate arguments are raised under personal policies. Because the Etchisons present no additional issues in this appeal, for simplicity we refer to the Etchisons and Tri-Etch, Inc. collectively as Tri-Etch.

4

of Appeals reversed summary judgment in favor of Cincinnati and remanded with instructions to enter summary judgment in favor of the Estate and Scottsdale and order Cincinnati to indemnify Tri-Etch for the remaining $1.5 million. Tri-Etch, Inc. v. Cincinnati Ins. Co., 891 N.E.2d 563, 572–73, 577 (Ind. Ct. App. 2008). The Court of Appeals held that the wrongful death claim arose from an "occurrence" under Cincinnati's policies. The Court of Appeals reasoned that Tri-Etch's failure to give prompt notice to the store manager was not intentional, and therefore was an "accident" which under the definition in the policy became an insured "occurrence." Id. at 574. The Court of Appeals also concluded that even if Tri-Etch provided untimely notice, Cincinnati was not prejudiced as a matter of law because it had also denied coverage for reasons other than late notice. Id. at 572. The Court of Appeals also ruled that Scottsdale was entitled to one half of its defense costs from the time Cincinnati was given notice of the claim. Id. at 577. This issue was remanded for resolution of the dispute as to when Cincinnati was given notice of Tri-Etch's claim. There was no explicit ruling on Scottsdale's claim for contribution to the amounts it paid to Tri-Etch or on Cincinnati's claim that an exclusion of coverage defeated Tri-Etch's claim as to the umbrella policy. We granted transfer.

## Standard of Review

Each party challenges a summary judgment order, which this Court reviews de novo. Lean v. Reed, 876 N.E.2d 1104, 1007 (Ind. 2007). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C).

## I. "Accident" or Commercial Error

Cincinnati's CGL and umbrella policies both insure against liability for "bodily injury" caused by an "occurrence." The policies follow the widely used CGL form defining "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The parties dispute whether Michael Young's death resulted from an "accident."[2] The Court of Appeals held that the Estate's claim for liability arising from

---

[2] The Estate first responds that Cincinnati has waived its coverage defenses by failing either to defend or to file a proper declaratory judgment action. Cincinnati is correct that an insurer may choose at its own

5

the loss was an "occurrence" because it was caused by Tri-Etch's unintentional oversight in failing to make the 12:30 a.m. call. Tri-Etch v. Cincinnati Ins. Co., 891 N.E.2d 563, 574 (Ind. Ct. App. 2008).

The complaint in the wrongful death action was for Tri-Etch's failure to call within a short time after it recorded the failure to set the alarm at midnight. The Estate argues that Tri-Etch's failure was an "accident," noting that no one claims that Tri-Etch intentionally delayed its call with the expectation that Young would be killed. Lack of intentional wrongdoing does not convert every business error into an "accident." This failure is the same sort of claim as lawyer malpractice, or an insurance agent's failure to secure coverage as the client directed. 1 Couch on Insurance § 1:35 (3d ed. 2005) ("Within professional liability insurance, several different coverages are available . . . [including] errors and omissions (E&O) coverage protecting against liability based on the failure of the insured, in his or her professional status, to comply with what can be considered in simplistic terms to be the standard of care for that profession. . . . E&O coverage appears in insurance policies protecting a wide variety of groups (not all of which fit the classical definition of 'profession'), including attorneys . . . [and] insurance agents . . . ."). Tri-Etch's failure was just such an "error or omission," not an "accident," and for that reason it is not an "occurrence" covered by Cincinnati's CGL and umbrella policies. The CGL policy does not guarantee the quality of work or products of its insureds. To the extent Tri-Etch had a duty to Young, it arose from its contract with Young's employer. This may give rise to tort liability. See Restatement (Second) of Torts § 324A (1965). But it does not convert a failure to meet a standard of care under a contractually assumed duty into an "accident." As explained below, that conclusion is consistent with precedent and the actions of the parties in this case.

Indiana courts have frequently addressed whether a given event qualifies as an "occurrence" under identical or similar definitions in CGL policies. Most recently, in Auto-Owners Insurance Co. v. Harvey, 842 N.E.2d 1279 (Ind. 2006), the issue was coverage under a homeowner's liability policy for a drowning after the insured pushed a woman into the Wabash River. The policy covered bodily injury caused by an "occurrence," defined as an "accident." We reaffirmed that "an accident means an unexpected happening without an intention or design,"

---

peril not to defend or seek a declaratory judgment, and failure to do either is not a waiver of defenses. Microvote Corp. v. GRE Ins. Group, 779 N.E.2d 94, 96 (Ind. Ct. App. 2002), trans. denied.

and found the policy applied because it was clear that the drowning was unintended even if the push was an intentional act. Id. at 1283–85. Although "accident" is broadly construed, in Harvey we noted the distinction between an "occurrence" as the term is used in CGL policies, and claims based on "commercial or professional conduct." Id. at 1284. Claims based on negligent performance of commercial or professional services are ordinarily insured under "errors and omissions" or malpractice policies. For this reason, CGL policies typically exclude claims arising out of professional or other business services.[3] Erie Ins. Group v. Alliance Envtl., Inc., 921 F. Supp. 537, 541 (S.D. Ind. 1996) (applying Indiana law); see, e.g., Transamerica Ins. Servs. v. Kopko, 570 N.E.2d 1283, 1284–85 (Ind. 1991) (holding that a claim against a home builder for property damage because of settled soil did not arise from an "accident"); Erie Ins. Co. v. Am. Painting Co., 678 N.E.2d 844 (Ind. Ct. App. 1997) (no coverage for property damage alleged to have arisen from negligent hiring and retention of an employee); Terre Haute First Nat'l Bank v. Pac. Employers Ins. Co., 634 N.E.2d 1336, 1338 (Ind. Ct. App. 1993) (a bank's negligent administration of a guardianship was a "professional relationship," not an "accident").

The record includes no conclusive evidence on the timing of notice to Cincinnati, but it permits the inference that the parties' actions in this case reflect their assumption that the Scottsdale policy applied and the Cincinnati policy did not. Scottsdale, which had included errors and omissions coverage in its policy, appears to have defended the underlying wrongful death case for almost five years without asserting any claim that Cincinnati should contribute. Similarly, under Cincinnati's view of the evidence, Tri-Etch asserted no claim to coverage by Cincinnati's underlying[4] CGL policy or its umbrella policy until March 17, 2004, when its

---

[3] Cincinnati's underlying CGL policy appears to contain an exclusion for product liability or negligence in providing services. The CGL policy excludes "bodily injury" included within the "products-completed operations hazard." The "products-completed operations hazard" is defined to include all "bodily injury . . . arising out of . . . 'your work.'" "Your work" includes "work or operations performed by you or on your behalf." Bodily injury arising out of Tri-Etch's alarm monitoring operation would appear to be excluded under this exclusion. We can only speculate that this exclusion explains why Tri-Etch also had the Sonitrol Dealers policy from Scottsdale, which in form is apparently an overlapping CGL policy with a $1 million limit, but also includes errors and omission coverage. Because these provisions were not addressed by the parties, we do not rely on them in resolving the appeal.

[4] The umbrella policy states that it is excess of the "underlying policies" defined to mean "the policies of insurance listed in the Schedule of Underlying Policies and the insurance available to the insured under all other insurance policies applicable to the 'occurrence.'" The parties do not address, and we do not decide whether this definition, presumably intended to permit cumulative stacking of all underlying policies, has

attorney wrote to Cincinnati reporting that "there is some risk of a verdict in excess of one million dollars."[5] Plaintiffs had offered to settle the claim for $750,000 in March 2004.

The Estate also argues that coverage is required under Cincinnati's CGL policy because the injury was to someone who was not a party to the contract and therefore could not be the basis of an errors and omissions claim. It is often the case that an errors or omissions claim is asserted by an insured rather than by a third party. But errors and omissions coverage is not limited to first-party claims. As Judge Hamilton explained in addressing the scope of an exclusion for professional services involved in Erie Insurance Group,

> Nothing in the language of the professional services exclusion here or in the reasoning of those cases limits the exclusion to claims brought by the clients of the professional, i.e., to first party claims. The exclusion here applies to damages or liability "due to any service of a professional nature" and does not require privity between the insured and the claimant.

921 F. Supp. at 542.

The Estate next argues that Cincinnati's policy applies because the liability action was tried on a tort theory, not on contract. It is true that "occurrences" ordinarily do not include contractual obligations. 9 Couch on Insurance § 126:29 (3d ed. 2008). But the obverse is not the case. Not all tort claims are necessarily "occurrences." See id. § 126:30 (intentional torts are not "accidents"). Moreover, as Couch explains,

> It is important to note . . . that there is a difference between risks that arise out of a business and business risks. While the former may be covered under a commercial general liability insurance policy, the latter is not. Business risk occurs as a consequence of the insured not performing well and is a component of

___

the effect of incorporating both Scottsdale's and Cincinnati's CGL policies if this were indeed an "occurrence."

[5] Tri-Etch's attorney's March 17, 2004 letter states that Cincinnati had been given notice of the case "when the case was filed" and that Cincinnati had refused to defend. The record includes no documentation evidencing any notice before 2004 and no documentation of any denial of coverage before that time. The record includes other conflicting evidence regarding when Tri-Etch first notified Cincinnati of the events surrounding Michael Young's death. Tri-Etch designated its answers to interrogatories stating that its owner discussed Young's death with Cincinnati's agent in the days following the event and that its employee forwarded the complaint and summons to Cincinnati's agent. The timing of "forwarding" is not explicitly stated, but it may be inferred to be shortly after Tri-Etch received the complaint. Cincinnati designated the affidavit of the agent stating that he was never presented with a claim arising out of Young's death. Cincinnati also designated the deposition testimony of its manager of the Young claim that notice was first received on, or shortly after, March 17, 2004.

every business relationship that is necessarily borne by the insured in order to satisfy its customers.

9A Couch on Insurance § 129:1 (3d ed. 2005). The same is true of contractually assumed duties that give rise to tort liability. Both require rating by an insurer that takes into account the particular business of the insured.

Finally, this is the third appeal of some aspect of this case. The Estate argues that this Court necessarily decided in the first appeal that Tri-Etch did not make a business mistake. This argument reads too much into our holding in Young v. Tri-Etch, 790 N.E.2d 456 (Ind. 2003). In that case, we held only that the liquor store's contract with Tri-Etch, which limited the time in which the store could bring suit against Tri-Etch, did not apply to claims by the Estate because Young was not a party to the contract. We did not address whether Tri-Etch's action was a business error or an accident.

## II.  Exclusions for Alarm Monitoring Services

Apart from the fact that Tri-Etch's error does not qualify as an "occurrence," there is no coverage under Cincinnati's umbrella policy for another reason. The umbrella policy specifically excludes bodily injury "arising out of any act, error or omission of the insured in rendering or failing to render telephone answering, alarm monitoring or similar services." The parties contested whether Tri-Etch had any obligation to note a failure to arm the system, or undertook to report any failure within any particular time. If there was any such obligation, we think a failure to note that the customer did not meet a scheduled arming of the system is at the core of "alarm services," just as much as calling to report a break-in. The jury resolved this issue against Tri-Etch. The jury's verdict necessarily established that Tri-Etch's failure breached its contractual obligation to the store or fell below the standard of care of a reasonable alarm company. The judgment therefore was for liability squarely within the exclusions of the umbrella policy.[6]

---

[6] The Estate argues that the phrase "similar services" is ambiguous and should therefore be read in favor of coverage. Because we conclude that Tri-Etch's error was part of its monitoring service, we do not address whether "similar services" is ambiguous.

9

The plaintiffs argue that the failure to make a prompt call was not part of "monitoring" because the alarm was shut off. But failure to observe and report the lack of a scheduled arming of the system at midnight is the crux of the Estate's theory of liability. In view of the jury's verdict, failing to make a 12:30 a.m. call was the result of Tri-Etch's failure to monitor or observe its own internal procedures.

The Estate also argues that this exclusion renders the umbrella policy illusory if it is read to exclude coverage for all alarm services. They reason that because Tri-Etch was in the security alarm business, the exclusion would have "effectively excluded coverage of all operations." We do not agree. An alarm service, like any business, can incur liability from everyday activities that are not unique to the business. It is therefore reasonable to obtain general liability coverage to insure against slip and fall accidents and the like. As Judge Hamilton explained,

> A professional services exclusion in a general business liability policy cannot be read so broadly as to exclude liability for any act at all taken in the course of providing professional services. Such a broad reading would exclude coverage, for example, for an automobile accident caused by . . . traveling from one professional meeting to another, or for negligent injury to a client visiting an . . . office.

Erie Ins. Group, 921 F. Supp. at 542–43. There may be gray areas or potential overlaps between professional services and general liability, for example if an installer of an alarm set fire to the customer's home. But if failure to report a missed arming of the system gives rise to liability it is surely liability for "failing to render . . . alarm monitoring . . . services."

### III. Late Notice and Prejudice

Cincinnati alleged that its policies did not cover the wrongful death claim because Tri-Etch did not timely notify Cincinnati, and this late notice prejudiced Cincinnati. As we recently observed in Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1271–72 (Ind. 2009), American jurisdictions fall into three groups on the need to establish prejudice from late notice. Some hold that prejudice is irrelevant to enforcement of a late notice defense. Others require an insurer asserting this defense to demonstrate actual prejudice, and a third group creates a rebuttable presumption of prejudice in favor of the insurer. As Dreaded noted, id. at 1272, Indiana is generally placed in the third category, with a citation to Miller v. Dilts, 463 N.E.2d 257 (Ind. 1984).

10

Miller specifically addressed the consequences of failing to comply with a policy provision requiring notice of a claim to the insurer. Miller held that a finding of prejudice is required to void coverage, but late notice was presumptively prejudicial to the insurer. Miller went on to make clear that the insured could offer evidence of lack of prejudice, in which case the insurer could offer evidence establishing prejudice. More recently, in Morris v. Economy Fire and Casualty Co., 848 N.E.2d 663, 666 (Ind. 2006), we dealt with provisions in a property damage policy that required the insured to produce documents and submit to examination under oath. Id. We unanimously held that these provisions were enforceable according to their terms without any showing of prejudice. Our opinion included the following observation:

> While disputes regarding alleged breaches of an insured's duty under a separate "cooperation clause" may necessitate consideration of resulting prejudice to the insurance company, such prejudice is not a necessary consideration in determining the enforceability of other insurance policy provisions.

Id. In Dreaded, we noted that the quoted statement from Morris might be taken to qualify Miller, but we did not need to address that question to resolve the issue then before us. We do not take Morris to alter the holding in Miller. Both Morris and Miller specifically distinguished breach of the policy provision in question in their cases from breach of a general cooperation clause, which does require that the insurer show prejudice to defeat coverage. The quoted language in Morris applies to some, but not necessarily all provisions in the policy "other" than the duty to cooperate. Miller specifically addressed late notice, and held that prejudice to the insurer is presumed by the insured's late notice, but the insured may rebut the presumption with evidence showing that the late notice created no prejudice. The parties have presented the case as one governed by Miller, and we reaffirm its holding today.

The Court of Appeals followed Miller, but reasoned that Cincinnati was not prejudiced by late notice as a matter of law because it "consistently maintained that Tri-Etch is not entitled to coverage under either of its policies for the claim resulting from Young's death." Tri-Etch v. Cincinnati Ins. Co., 891 N.E.2d 563, 572 (Ind. Ct. App. 2008). We do not agree that an insurer's denial of coverage on other grounds as a matter of law rebuts the presumption of prejudice from late notice existing under Miller. There is no reason why an insurer should be required to forego a notice requirement simply because it has other valid defenses to coverage. If there is no prejudice to the insurer from lack of notice, the absence of prejudice does not arise from the insurer's taking the position that it also has other valid defenses to coverage. Rather, it arises

11

from the insurer's taking no action with respect to the claim because of its other defenses. Even if an insurer consistently denies coverage, timely notice gives the insurer an opportunity to investigate while evidence is fresh, evaluate the claim, and participate in early settlement. The fact that an insurer asserts other coverage defenses does not render these opportunities meaningless. It is a fact issue whether the other defenses would have caused the insurer, if given timely notice, to do nothing with respect to the claim. However, because we find that Cincinnati's policies did not apply to this claim, we do not consider whether Tri-Etch's notice was late or, if so, whether the late notice prejudiced Cincinnati.

## Conclusion

The trial court's denial of summary judgment on Cincinnati's coverage defenses is reversed, and the case is remanded with instructions to enter judgment for Cincinnati.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.