In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2274

WEST BEND MUTUAL
INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

ARBOR HOMES LLC,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-832-TAB-TWP—**Tim A. Baker,** *Magistrate Judge.*

ARGUED SEPTEMBER 28, 2012—DECIDED JANUARY 8, 2013

Before POSNER, ROVNER and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* A plumber hired by homebuilder Arbor Homes, LLC, ("Arbor") made one of the biggest mistakes a plumber can make: he forgot to connect the home's drainage system to the city's sewer. The question here is whether Arbor or the plumber's insurer is liable for the resulting damages to the newly built home. Although Arbor behaved very admirably in addressing the problem for the new homeowners, it failed to protect

its own interests, and we must affirm the judgment in favor of the insurer.

## I.

Arbor builds single-family homes in central Indiana. In 2005, Arbor contracted with Willmez Plumbing Inc. ("Willmez") for plumbing services in connection with the construction of new homes. The contract required Willmez to obtain insurance:

> Contractor [Willmez] shall take out, carry, and maintain the following insurance to protect Contractor and Owner [Arbor] . . .
>
> > (b) Comprehensive General Liability insurance to protect against bodily injury and property damage in an amount of not less than $1,000,000 per Occurrence;
> >
> > . . . .
> >
> > (d) Umbrella Liability Insurance in an amount of not less than $1,000,000.

R. 80, at 9. The contract also required that the insurance policies name Arbor as an additional insured. Any subcontractors hired by Willmez were bound to the same contract terms as Willmez.

In 2006, Arbor issued three purchase orders to Willmez to serve as Arbor's plumbing subcontractor for the construction of a new home. The plumbing work included underslab plumbing, plumbing rough-in, and plumbing finish work on the house. Willmez, in turn, subcontracted

the work to Oscar Alarcon, d/b/a A & M Plumbing Company. Plumbing work began on the home in December 2006 and was ostensibly completed in February 2007. Homebuyers Kurt and Joy Lorch closed on their purchase of the house on March 8, 2007 and moved in shortly thereafter.

The Lorches soon noticed a foul odor emanating from the lower part of the house. The smell grew worse over time and the Lorches began to feel ill. Unfortunately, A & M Plumbing had failed to connect the home's plumbing to the main sewer line, and raw sewage was being discharged into the crawl space of the home. The Lorches complained to Arbor, and on April 1, 2007, Arbor confirmed that the plumbing had not been properly installed. At Arbor's request, Willmez connected the main sewer line. On April 2, Arbor engaged ACT Environmental Services, Inc. ("ACT") to assess the damage. ACT tested the home and developed a plan to remove the sewage and decontaminate the home. Arbor then hired a number of contractors to fulfill ACT's recommendations. The required clean-up was comprehensive and costly. The crawl space was excavated to a depth of twelve inches and then restored with clean materials. Everything from the furniture and insulation to the ductwork required decontamination because of the extensive spread of dangerous bacteria and mold from the discharge of raw sewage into the home. In the end, Arbor paid more than $65,000 for cleaning, repairs and follow-up testing for the home.

Not surprisingly, the Lorches, who had purchased a brand new home, were unwilling to accept a brand new

home that had been filled with sewage and then cleaned. On April 18, 2007, they sent a letter to Arbor demanding, among other things, that Arbor buy the home from them and build them a new home. In April and May 2007, Arbor and Willmez discussed possible resolutions of the Lorches' claims. Arbor told Willmez to place its insurer, West Bend, on notice of the Lorches' claims. On May 4, 2007, Arbor also sent a letter to Willmez memorializing the parties' understanding of a settlement with the Lorches, and Willmez's responsibilities. In that letter, Arbor requested that Willmez or West Bend contact Arbor immediately if Willmez or the insurer needed any additional information regarding the settlement. Willmez later told Arbor that it forwarded this letter to West Bend.

Hearing nothing from West Bend, Arbor assumed the insurer had no objections to the settlement. On June 6, 2007, Arbor signed a settlement agreement with the Lorches that provided the homebuyers with a complete remedy. Among other things, Arbor agreed to buy the tainted home from the Lorches, build another new home for them (using a different plumbing contractor), pay for all of the closing costs and moving expenses related to the new home, and compensate the Lorches for any increase in their mortgage rate on the purchase of the second home.

Arbor then filed suit against Willmez in state court, alleging negligence, breach of contract, breach of the settlement agreement, slander of title, and constructive fraud. On October 12, 2007, Arbor's lawyer sent a copy

of the complaint to West Bend, noting that Arbor was an additional insured on the relevant insurance policies and asking West Bend to discuss the resolution of the dispute. West Bend denied any liability under the insurance policies in the state court proceedings, and ultimately filed a declaratory judgment suit in federal court against both Willmez and Arbor.[1] In federal court, West Bend sought a declaration that it had no duty under the insurance policies to defend and indemnify Arbor against the Lorches' claims and the settlement agreement. West Bend was not aware of any problem with the Lorches' home until May 4, 2007, and did not learn of Willmez's agreement to cover a large part of the damages until October 2007, when it received a copy of Arbor's lawsuit against Willmez. The insurer was not aware of the terms of the settlement with the Lorches until April 2008.

West Bend denied coverage for Arbor under a number of different theories. Initially, West Bend insisted that Arbor was not an "additional insured" under the policies. West Bend later acknowledged that this position was factually incorrect and conceded that Arbor should have been treated as an additional insured under its policies with Willmez. West Bend also denied cov-

---

[1] West Bend sought declarations related to Willmez that are not part of this appeal. Willmez failed to appear and defend against West Bend's declaratory judgment action, and West Bend ultimately obtained a default judgment against Willmez. We will address only the claim that relates to Arbor because only that claim is on appeal.

erage under three provisions of the insurance contracts: the fungi and bacteria exclusion, the voluntary payment provision, and the completed-operations provision. The district court granted summary judgment to West Bend, finding that the insurer was relieved of any duty to defend or indemnify Arbor under the fungi and bacteria exclusion as well as the voluntary payments provision. Arbor appeals.

## II.

On appeal, Arbor contends that a provision excluding coverage for damages caused by fungi and mold in a commercial general liability policy issued to a plumber renders the coverage illusory. Arbor also maintains that coverage may not be denied under the voluntary payments provision because West Bend denied for years that Arbor was an additional insured, and thus West Bend would not have participated in settlement discussions even if it had been given the opportunity to do so. Finally, Arbor argues that the completed-operations exclusion should not apply where the plumbing work was never "completed" as promised.

A district court sitting in diversity must apply the choice of law principles of the forum state (in this case Indiana) to determine which state's substantive law governs the proceeding. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006); *French v. Beatrice Foods Co.*, 854 F.2d 964, 966 (7th Cir. 1988) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941)). The parties agree that the insurance contract for the Indiana con-

struction project at issue in this diversity action is governed by Indiana law. *See Dunn v. Meridian Mutual Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005) (an insurance policy is governed by the law of the principal location of the insured risk during the term of the policy). We review the district court's grant of summary judgment *de novo*. *Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010).

We begin (and end) our analysis with the voluntary payments provision of the insurance contract. The contract assigns several duties to the insured in the event of an occurrence that may result in a claim. For example, the insured must notify West Bend as soon as practicable of any occurrence, and provide details of the incident. The insured must also tell West Bend of any claims or lawsuits brought against the insured, and cooperate with the insurer in the investigation or settlement of any claim. Most important for our purposes is the voluntary payments provision that comes at the conclusion of the list of obligations for the insured:

> No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

R. 53-2, at 13. The purpose of this reasonable and prudent provision is obvious. West Bend must have the opportunity to protect itself and its insured by investigating any incident that may lead to a claim under the policy, and by participating in any resulting litigation or

settlement discussions.[2] Any insured that settles a claim without West Bend's knowledge or consent does so at the insured's own expense under the express language of this provision. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1271 (Ind. 2009) (a voluntary payment provision that clearly prohibits the assumption of financial obligation must be given its plain and ordinary meaning). *See also Travelers Ins. Co. v. Maplehurst Farms, Inc.*, 953 N.E.2d 1153, 1161 (Ind. Ct. App. 2011) (when an insured enters into a settlement agreement without the insurer's consent in violation of a voluntary payment provision, that obligation cannot be recovered from the insurer).

Yet neither Arbor nor Willmez obtained West Bend's consent before settling. Instead, Arbor relied on Willmez to place the insurer on notice and then construed the insurer's subsequent silence as a lack of objection to the settlement with the Lorches. Arbor now can produce no evidence that West Bend consented to Willmez's settlement with Arbor or Arbor's settlement with the

---

[2] Voluntary payment provisions in insurance contracts also guard against the problem of moral hazard. *See Amerisure Ins. Co. v. National Sur. Corp.*, 695 F.3d 632, 635 (7th Cir. 2012) (describing a moral hazard as a situation where the party taking the risk will not bear the costs of its behavior); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 773 (7th Cir. 2010) (describing moral hazard as the tendency to take additional risks or run up extra costs when another party is financially liable). There is no evidence in this case that Arbor unilaterally ran up settlement costs.

Lorches. West Bend has produced uncontroverted evidence that it knew nothing of the damage to the home until after Willmez and Arbor agreed on their respective liabilities to each other and to the Lorches. And West Bend knew nothing of the terms of the settlement agreement signed with the Lorches until after Arbor's lawsuit against Willmez was underway. There is no evidence that West Bend "consented" to any settlement as required by the voluntary payments provision. Although Arbor behaved admirably in expeditiously resolving the matter for the homeowners, it failed to protect its own interests when it relied on Willmez to notify West Bend about the incident, and failed to obtain West Bend's consent for any settlement. Having no opportunity to participate in the investigation or settlement, West Bend is entitled to enforcement of the plain language of the contract: Arbor's settlements with Willmez and with the Lorches without the consent of West Bend is at Arbor's own expense. *Travelers Ins.*, 953 N.E.2d at 1161.

Arbor contends that West Bend may not rely on the voluntary payments provision to bar coverage because West Bend refused to recognize Arbor as an "additional insured" from October 2007 through August 2010. Arbor argues that notice to West Bend would have been futile because West Bend refused to treat it as an insured.[3]

---

[3] Arbor did not raise this futility argument in the district court and it is therefore waived. *Umezurike v. Holder*, 610 F.3d 997, 1003 (7th Cir. 2010). In any case, Arbor has failed to cite any case indicating that futility may negate a voluntary pay-
(continued...)

Moreover, Arbor maintains, West Bend suffered no prejudice by Arbor's late notice because West Bend would not have participated in settlement negotiations even if it had received the requisite notice sooner.

There are a number of flaws with Arbor's arguments under the facts and under Indiana law. First, the "voluntary payments" provision is not a notice provision, *per se*, but a consent provision. That is, under the clear language of the provision, the insurer must **consent** to a payment, obligation or expense before the insurer is liable for that amount. West Bend produced admissible evidence that it did not consent to (1) the settlement between Arbor and Willmez memorialized in the May 3, 2007 letter from Arbor to Willmez; or (2) the June 6, 2007 settlement between Arbor and the Lorches. Arbor has produced no evidence that West Bend consented to either settlement, and so there are no disputed issues of fact regarding West Bend's lack of consent. Second, as a matter of Indiana law, prejudice (or the lack thereof) is irrelevant in the enforcement of a voluntary payment provision. *Travelers Ins.*, 953 N.E.2d at 1161 (prejudice is irrelevant when an insured enters into a settlement agreement without the insurer's consent in violation of a voluntary payments provision).

Finally, Arbor's reliance on *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997 (Ind. 2009), is misplaced. *Tri-Etch*

---

[3] (...continued)

ment provision, and we see no reason to recognize an exception to the express language of the contract. We will therefore not address this argument further.

addressed the role of prejudice when the insured gives late notice to the insurer. The court first confirmed that late notice by the insured gives rise to a rebuttable presumption of prejudice to the insurer. 909 N.E.2d at 1005. But the court concluded that an insurer's denial of coverage on other grounds does not, as a matter of law, rebut the presumption of prejudice from late notice:

> There is no reason why an insurer should be required to forego a notice requirement simply because it has other valid defenses to coverage. If there is no prejudice to the insurer from lack of notice, the absence of prejudice does not arise from the insurer's taking the position that it also has other valid defenses to coverage. Rather, it arises from the insurer's taking no action with respect to the claim because of its other defenses. Even if an insurer consistently denies coverage, timely notice gives the insurer an opportunity to investigate while evidence is fresh, evaluate the claim, and participate in early settlement. The fact that an insurer asserts other coverage defenses does not render these opportunities meaningless. It is a fact issue whether the other defenses would have caused the insurer, if given timely notice, to do nothing with respect to the claim.

*Tri-Etch*, 909 N.E.2d at 1005.

According to Arbor, because West Bend denied that Arbor was an additional insured, there remains a disputed question of fact regarding whether West Bend would have behaved differently—whether it would

have done nothing—if Arbor (or Willmez) had given notice to West Bend in time for the insurer to take part in settlement negotiations. But as we noted above, this is not a notice case. The voluntary payment provision relieves West Bend of the obligation to pay not because the insured provided late notice but because West Bend did not consent to any voluntary payments or obligations assumed by Arbor or Willmez. If anything, *Tri-etch* demonstrates that West Bend did not lose the opportunity to assert its rights under the voluntary payments provision simply because it denied for a time that Arbor was an additional insured. Although Arbor's quick and decisive aid to the Lorches was laudable, the failure of Arbor (or Willmez) to obtain West Bend's consent to the settlement relieves the insurer of any obligation to pay for the damages caused by the plumber's negligence.

AFFIRMED.